UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT LEE FOSTER,

                Petitioner,                Case No. 1:07-cv-854

v.                                          Honorable Janet T. Neff

WILLIE O. SMITH,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving a term of life in prison, imposed by the Calhoun County Circuit Court

on June 13, 2005, after a jury convicted Petitioner of first-degree, premeditated murder, Mich. Comp.

Laws § 750.316(1)(a). In his amended *pro se* petition, Petitioner raises four grounds for relief, as

follows:

I.      INSUFFICIENCY OF THE EVIDENCE

II.     INEFFECTIVE ASSISTANCE OF COUNSEL

III.    DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
AND A FAIR TRIAL BASED UPON COUNSEL['S] FAILURE TO SEEK
A COMPETENCY EVALUATION IN LIGHT OF PETITIONER['S]
HISTORY OF HOSPITALIZATION FOR MENTAL ILLNESS IN
VIOLATION OF THE CONSTITUTION OF THE UNITED STATES,
AMENDMENT VI ASSISTANCE OF COUNSEL CLAUSE, AND
AMENDMENT XIV, DUE PROCESS CLAUSE

IV.    DEFENDANT WAS DENIED A FAIR TRIAL BECAUSE OF THE
PROSECUTORIAL MISCONDUCT ERODING THE PRESUMPTION OF
INNOCENCE.

(Am. Pet., docket #46, Page ID##236, 237, 239, 240.)

Respondent has filed an answer to the amended petition, stating that the grounds should be denied because they are procedurally defaulted and/or because they are without merit (docket #49). Petitioner has filed a reply to the answer (docket #55). Upon review and applying the AEDPA standards, I find that the grounds for relief are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

A.     Trial Court Proceedings

The state prosecution arose from the death of Petitioner's wife, Deborah Foster, on March 25, 2004, after she sustained multiple stab wounds to her torso and neck and blunt force trauma to the back of her head. Petitioner was charged with open murder for the killing of his wife. A pre-trial examination hearing was set for March 31, 2004, but Petitioner's appointed counsel moved for an adjournment. (Adjournment Hr'g Tr., docket #15.) At the adjournment hearing, the court asked Petitioner if he was willing to waive his right to an exam within 14 days of his arraignment. Petitioner stated, "I don't want to do that. I wish to confess to the murder of my wife in the first degree." (*Id.* at 4.) The court then advised Petitioner to remain silent and it set a new date for the preliminary exam. (*Id.* at 4-5.)

After the preliminary exam, Petitioner was bound over on the murder charge. In November 2004, his counsel moved for a competency evaluation based on Petitioner's history of mental illness. Petitioner was evaluated for competency in January 2005. In February 2005, the court reviewed a report from the examining physician and concluded that Petitioner was competent

to stand trial. Petitioner was tried before a jury beginning on May 25, 2005, and concluding on June 2, 2005.[1]

At trial, the victim's son, Joel Scott Moore, testified that his mother married Petitioner in December 2002, and she lived with Petitioner for several months until she decided to move out. (Tr. II, at 209-11.) Deborah told her son that she was divorcing Petitioner because she felt threatened by him. (*Id.* at 211.) She lived with Moore for a few months, and then moved into an apartment in Battle Creek, Michigan, at 287 Capital Avenue. (*Id.* at 212.) Later, in November 2003, Moore helped his mother secure a personal protection order (PPO) against Petitioner. (*Id.* at 213-14.)

Noreen Alice White was a friend of Deborah's and lived in the same apartment building with her. (Tr. II, at 312-13.) She testified that on one occasion she heard Petitioner and Deborah arguing inside their apartment. Petitioner stated, "If I can't have you, Bitch, there ain't nobody gonna have you." (*Id.* at 319.) White looked through the window of Deborah's apartment and saw that Petitioner had a knife in his hand. (*Id.* at 320.)

Margo Cummins testified that she was a family advocate at Safe Place. (Tr. II, at 298.) Safe Place is a women's shelter adjacent to the apartment building at 287 Capital Avenue. (*Id.* at 279.) She gave information to Deborah about obtaining a PPO against Petitioner. A few days before Deborah was killed, she asked Cummins to attend a court hearing where Petitioner was to be

---

[1]The trial transcripts will be referred to as follows:

Tr. I    - Jury Trial Volume 1, May 25, 2005 (docket #22),
Tr. II   - Jury Trial Volume 2, May 26, 2005 (docket #23),
Tr. III  - Jury Trial Volume 3, May 27, 2005 (docket #24),
Tr. IV   - Jury Trial Volume 4, May 31, 2005 (docket #25),
Tr. V    - Jury Trial Volume 5, June 1, 2005 (docket #26),
Tr. VI   - Jury Trial Volume 6, June 2, 2005 (docket #27).

arraigned for violating the PPO.  (*Id.* at 301.)  Cummins saw Deborah at Safe Place on the morning of March 24, 2005; she appeared to be afraid and seemed upset because of Petitioner.  (*Id.* at 303.)

Lola VandenBerg, the kitchen director at the Salvation Army in Battle Creek, testified that Deborah worked for her as a volunteer in the kitchen.  (Tr. II, at 245.)  On March 25, 2004, Deborah spoke with Lola and stated that she did not want Petitioner living with her because she was afraid of him.  (*Id.* at 254.)

John Gatson, Jr., testified that he had known Deborah for a long time.  He worked with her at the Salvation Army on March 25, 2004, the day of the murder.  (Tr. V, at 771, 776.)  At 1:30 pm that afternoon, he gave Deborah a ride home in his van, along with three other community service workers.  (*Id.* at 772.)  He saw Petitioner when they were approximately five blocks from Deborah's building.  (*Id.* at 773, 775-76.)  Petitioner waved at them and Gatson honked his horn. Gatson then proceeded to take Deborah to her apartment building.  They arrived shortly before 2:00 pm.  (*Id.* at 773.)

Jan Acker was a friend of Deborah's.  At around 2:23 pm on March 25, 2004, she received a call from Deborah and spoke with her for a few minutes.  (Tr. II, at 266-68.)  During the call, she heard Petitioner's voice in the background.  (*Id.* at 268.)

Sara Ann Wallace was the domestic systems violence coordinator at Safe Place on the date of the offense.  (Tr. II, at 277.)  She saw Deborah at the shelter at around 11:00 on the morning of March 25, 2004, when Deborah was being escorted out of the building by Margo Cummins.  (*Id.* at 278.)  Deborah appeared to be "shaky" and "frazzled."  (*Id.*)  Later that afternoon, Wallace was standing in the administrative building of Safe Place when she heard some commotion coming from the direction of Deborah's building.  (Tr. II, at 280.)  She looked outside and saw a

woman coming out of the apartment building who was "all red"; the woman was screaming for help and struggling to stand. (*Id.* at 281.) Wallace ran outside to get a closer look and recognized the woman as Deborah, who was covered in blood. (*Id.* at 282.)

Kevin Young lived in an apartment building near Deborah's. (Tr. II, at 347-48.) At around 11:00 on the morning of March 25, 2004, he saw Petitioner and Deborah having an argument at the door of her apartment. (*Id.* at 354.) He heard Petitioner ask her to let him inside. When she refused, he became upset, calling her a "bitch" and a "fat ass." (*Id.* at 355.) Petitioner then left and walked down the street. Young went out for a walk later that day. As he was headed home, at around 3:00 pm, he saw Petitioner walking "fast" down a driveway and then across the street. (*Id.* at 357-58.) When Young arrived at the entrance to his apartment, a man approached him and said that someone was "laying in the back yard bleeding to death." (*Id.* at 357.) Young walked toward Deborah's apartment building and saw her lying on the ground, so he called 911. Young approached Deborah and heard her "gargling." (*Id.* at 360.) She was lying on her back; her shirt was full of holes and it was covered in blood. Young could hear her ask for help. (*Id.*) The 911 dispatcher told him to move her onto her side so that she would not choke on her blood. He did so, but she died shortly thereafter. (*Id.* at 361-63.)

Officer Aaron Smith was one of the first police officers to arrive at the scene in response to the 911 call. He saw Deborah's body on the ground; her head and shoulders were covered with a towel. He noticed a knife blade next to her body. (Tr II, at 380-83.)

Officer Ken Millikin arrived at the scene immediately after Officer Smith. He observed a trail of blood leading from Deborah's body to the door of her apartment. He followed the trail inside the apartment to the back bedroom, where he found what appeared to be the handle

of a steak knife.  (Tr. II, at 388-89.)  Also, on the bed, he saw a "pan or pie plate" with a knife inside it.  (*Id.* at 391.)

Officer Shawn Follett, a trained "K-9 handler" with a tracking dog, was called to assist at the crime scene.  (Tr. III, at 433-34.)  After he arrived, his dog led him on a trail down the street, around the corner, across a parking lot, over two fences, between two houses, and then to the front door of a white house located at 171 Cherry Street.  (*Id.* at 440-42.)

Fred Brewer lived at 171 Cherry Street.  He was sitting in his car outside his home at around 3:00 pm on March 25, 2004, when Petitioner walked up and asked permission to come inside the house.  (Tr. V, at 726-29.)  Petitioner was carrying a garment bag over one shoulder.  Brewer noticed that he was bleeding from his arm.  (*Id.* at 729.)  Brewer stated that he had to leave to pick up his daughter from school and asked Petitioner to wait until he returned.  (*Id.* at 728-29.)  Brewer then left to go to a liquor store but changed his mind and decided to return to his house.  (*Id.* at 730.) When he returned, he discovered that Petitioner was already inside.  (*Id.*)

Officer Brian Neil was on patrol that day.  (Tr. III, at 450.)  He learned about a stabbing on the radio and heard that a suspect was in a house on the corner of Cherry and Elm streets.  Officer Neil happened to be in his vehicle at that location, so he pulled over and parked his car just as Officer Joel Case arrived.  Officers Neil and Case approached the house together and observed blood on the sidewalk and steps leading up to the house.  A woman inside the doorway motioned to them and indicated that a man was upstairs.  Officers Neil and Case walked up the stairs with their weapons drawn and found Petitioner standing behind a railing, holding a towel that was dripping with blood.  (*Id.* at 454.)  Officer Neil noticed that one of Petitioner's hands was bleeding profusely, and both of his hands were covered in blood.  Officer Neil put Petitioner in handcuffs.  Another

police officer arrived at the house and asked Officers Neil and Case whether they had checked the house for a knife.  (*Id.* at 459.)  Petitioner apparently heard the question, as he stated, "the knife's not up there, it's in my wife's house."  (*Id.* at 460.)

After his arrest, Petitioner was taken to a hospital for treatment of his hand.  Nina Stravers was working at the hospital that day, registering patients as they arrived in the emergency room.  (Tr. IV, at 633, 635.)  When she saw Petitioner, she asked him why he was at the hospital; he stated that his wife came at him with a knife, so he took it away from her and stabbed her.  (*Id.* at 640.)

Officer Timothy Bennett, who was with Petitioner at the hospital, heard Petitioner's statement to Stravers.  (Tr. IV, at 649-50.)  Petitioner also told Bennett that "he just couldn't take it anymore" because "he saw his wife getting out of a van with two unknown male subjects[.]"  (*Id.* at 652.)  Petitioner indicated that his wife had cheated on him and that they had "ongoing problems." (*Id.* at 653.)  Petitioner also stated that "he was a dead man and that he was going to jail for a long time."  (*Id.*)

Bennett later took Petitioner to the Calhoun County Jail and was present during the booking process.  According to Bennett, Petitioner became "agitated" during that process and stated that "he had just killed his wife and that he would appreciate it if they would hurry up with the questioning so he could go take a nap or go lay down."  (*Id.* at 659.)

Detective Maria Alonso of the Battle Creek Police Department was assigned to lead the investigation into Deborah's killing.  (Tr. IV, at 618-19.)  She interviewed Petitioner after he was taken into custody, and a video of that interview was played to the jury.  During the interview, Petitioner denied killing his wife.  (*Id.* at 629.)

Michael Allen Markey, a forensic pathologist, conducted the autopsy on Deborah's body. (Tr. V, at 697.) He noted a cutting wound on the back of her neck and multiple stab wounds, including four on her chest, one on the right side of her neck, and fourteen on her upper back. (*Id.* at 700.) He also noted several "blunt force" injuries, the most significant of which was located on the back of her head. (*Id.* at 704-05.) He opined that her death was likely caused by multiple stab wounds and a blunt force injury to the head. (*Id.* at 715.)

Martin Brown, the supervisor of the Battle Creek Police Department crime lab, testified about the physical evidence collected from the crime scene. In Deborah's bedroom, police officers found a frying pan without a handle, a knife, and a knife handle. (Tr. III, at 502, 508.) They also found a knife in the hallway outside the bedroom, and a knife blade in the parking lot outside of Deborah's apartment building. (*Id.* at 507, 509.) In addition, a suitcase/garment bag was collected from the house where Petitioner was arrested. (Tr. IV, at 557.) Inside the bag were several articles of clothing that were covered in blood, as well as blood-covered latex gloves, safety goggles, and several pairs of Kellogg-brand underwear inside their original plastic containers. (*Id.* at 543-44.)

Ann Gordon, a DNA analyst for the Michigan State Police, testified that she conducted tests comparing DNA samples recovered from the crime scene to DNA samples from Petitioner and the victim. The knife handle found in the hallway of Deborah's apartment tested positive for Deborah's blood. (Tr. V, at 751-52; Tr. III, at 507.) The knife blade recovered from the parking lot outside the apartment also tested positive for her blood. (Tr. V, at 754; Tr. III, at 509.) Samples taken from walls in the bedroom and hallway of the apartment tested positive for Petitioner's blood. (Tr. V, at 755-56, 764-65.)

After the prosecution presented its case, Petitioner's counsel moved for a directed verdict, arguing that there was insufficient evidence to convict Petitioner of first-degree, premeditated murder.  (Tr. V, at 781.)  The trial court denied the motion.

After a brief recess, Petitioner's counsel informed the court that Petitioner intended to testify in his defense in a narrative format.  Counsel stated:

> I've had discussions with Mr. Foster before regarding his - whether or not he wants to testify.  I've informed him that that's his absolute right.  I've given him my advice on that matter and after our discussions he's informed me that he does wish to testify.

> I've also informed him that ethically at this point I don't think I would be able to ask him any questions as far as I understand my situation.  I'll do some more research over the lunch hour but I've informed him that he would be testifying in a narrative and he's indicated to me that he understands that and still wishes to testify.

(Tr. V, at 784.)

After another break, Petitioner took the stand and testified, stating:

> Me and my wife stopped living together on March the 25th, 2004 and as a result of her death and that morning - in the afternoon, I'm the one responsible for the death of my wife.  I started to cut her head off but I didn't for the simple reason I loved her.

> She called her boyfriend on me that morning, that evening after I get - I tried all I could to be a good man to my woman.  I worked very hard at getting out of prison to come back here to society and be a productive person and I chose this woman over every other woman and all she did is made a fool of me, embarrassed me, you know, and she just dictated the end result of what happening right now and also what she failed to realize the end result that might come for her.

> . . . the bottom line is that she called her boyfriend on me right in front of my face.  She said, "John, he's just standing here in the middle of the floor just looking at me, John," and she - "Just come on over, John, come on over," you know, "he's leaving here."

> And then she hung up the phone, I said, "You got to be out of your mind," you know, she broke to the bedroom so I went behind her to the bedroom, sitting -

I had completely forgot about what she had just did because I was trying to - I was trying to talk to my wife and figure out, reason with her, what's wrong with you, you know.

\* \* \*

Right - right before the incident, she called her boyfriend on me and then, as I was trying to reason with my wife and talk to her, she was just rejecting me in every way and she went to the kitchen. She staged - she opened up the kitchen door . . . she cocked the screen open with a skillet.

I'm still in the bedroom and she started running her mouth to me about she don't never let her mens go and this and that and, "Robert, I don't know if I really want you anymore," and this and that and the other and so she come back to the bedroom. I got up and I went to the kitchen and I noticed that she set a stage either for a exit way or an entry way and that's when it started clicking on me she just called this guy on me. . . .

At that point I realized . . . she had a knife in the bedroom. . . . My wife was going to stab me once I positioned myself in the bed, she was going to rise up and stab me to protect her boyfriend because her boyfriend was on his way over and I had told her that I would kill him if he continued messing with you.

\* \* \*

So I went back into the kitchen, I grabbed two knives, the ones that you saw here. I had no idea at that point that I was gonna kill her but I had said - I had left there and I went back to my old address and I come back. On my way back, I just - I'm gonna kill her so I believe that my actions was deliberate and intentional, you know, because when I hit my wife with that frying pan, I knew that that was one lick too many and there's no sorry or apology that I can give for that lick. I have told her in advance, "Baby, if I ever hit you or stab you, I will not be able to stop," you know.

So when I hit her with that frying pan and I re - then I just went on with the rest. I stabbed her through the back of the head, back of the neck and pushed the knife all the way through 'til it came out the front of her throat and then I hit her again through the heart. I hit her twice. I started to cut her head off, you know, that's the way I felt. I wanted to cut her head off and take it all the way down the driveway and throw it in the middle of Northeast Capital but I couldn't do that because I love my wife, but I was gonna put her out of her miseries and put myself out of the miseries that she was taking me through at the expense of my life, my freedom and everything.

\* \* \*

> I picked a woman old enough . . . to understand right from wrong and a woman that was old enough that had her own grown kids . . . and I chose her and I wanted her.

> So we made an agreement. She didn't stick to our agreement and she made my life miserable. She gave me no option to get out of the relationship. . . .

(Tr. V, at 786-92.)

After the jury heard closing arguments and jury instructions, it rendered a verdict finding Petitioner guilty of first-degree, premeditated murder. On June 13, 2005, the court sentenced Petitioner as an habitual offender to life in prison without the possibility of parole.

### B.    Direct Appeal

Petitioner appealed his conviction as of right to the Michigan Court of Appeals, arguing (1) that the trial court should have granted his motion for a directed verdict because there was insufficient evidence to convict him of first-degree, premeditated murder, and (2) that his counsel was ineffective for allowing him to testify in a narrative format. By unpublished opinion issued on December 21, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction and sentence. (*See* 12/21/2006 Mich. Ct. Appeals Opinion (MCOA Op.), docket #30.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court, raising the same arguments below. On May 30, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 5/30/2007 Mich. Order, docket #31.)

C.    Post-conviction relief

Petitioner filed the instant action in August 2007, raising two grounds for relief (*see* Pet., docket #1), which are now Grounds I and II in the amended petition (*see* Am. Pet., docket #46). In November 2008, he asked the Court to stay this action so that he could exhaust additional claims in state court.  The Court granted the stay on January 23, 2009, and Petitioner filed a motion for relief from judgment in state court on February 15, 2009, raising the issues in Grounds III and IV of the amended petition.  (*See* Am. Pet., docket #46, Page ID#233.)  His motion was denied on March 12, 2009.  Petitioner appealed that decision to the Michigan Court of Appeals and then to the Michigan Supreme Court.  Those appeals were denied on October 21, 2009, and May 25, 2010, respectively, for failure to meet the burden of establishing entitlement to relief under Rule 6.508(D) of the Michigan Court Rules.  Petitioner filed his amended petition on July 21, 2010.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411;

*accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**<u>Discussion</u>**

**Ground I.  Insufficient evidence**

Petitioner first argues that the evidence was not sufficient to convict him of first-degree murder, because there was no evidence of premeditation or deliberation.  A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*   Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA."  *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008); *accord Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

In Michigan, first-degree murder is a specific intent crime requiring proof that the defendant intended to kill and that the intent was deliberate and premeditated. Mich. Comp. Laws § 750.316; *see also People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). Premeditation and deliberation require a lapse of time between the initial homicidal intent and ultimate action sufficient to afford the defendant an opportunity to subject the nature of his conduct to a "second look." *People v. Tilley*, 273 N.W.2d 471, 473-74 (Mich. Ct. App. 1979). A sufficient time lapse may be merely "seconds, or minutes, or hours, or more, dependent on the totality of the circumstances surrounding the killing." *People v. Meier*, 209 N.W.2d 311, 318 (Mich. Ct. App. 1973). Premeditation and deliberation may be inferred from all of the facts and circumstances surrounding the incident, including (1) the parties' prior relationship, (2) the actions of the accused both before and after crime, and (3) the circumstances of the killing itself. *Anderson*, 531 N.W.2d at 786; *People v. Haywood*, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995).

The trial court concluded that there was sufficient evidence to sustain a conviction of first-degree murder, considering only the evidence presented before Petitioner took the stand. (Tr. V, at 782.) On appeal, the Michigan Court of Appeals affirmed that decision and rejected Petitioner's claim, noting the "overwhelming" evidence presented by the prosecution that Petitioner killed his wife:

> After defendant was arrested, police transported him to a hospital where defendant acknowledged to the emergency room nurse that he stabbed his wife. After defendant was transported to the jail, defendant told the booking officers that he had killed his wife and would appreciate it if they would hurry up with their questioning so he could lie down. Defendant was seen leaving the apartment complex "quite fast," while Deborah emerged from the building covered in blood. When defendant was apprehended, his hands were covered in blood. Defendant informed police that the knife was at his wife's house, and defendant's blood was discovered on the walls inside Deborah's apartment. Further, the evidence established that the relationship

between defendant and his wife was volatile. Defendant and his wife had been married for less than a year when Deborah moved out of the marital home, filed for divorce, and obtained a personal protection order (PPO) against defendant. Five days before the killing, defendant violated the PPO. On the day Deborah was killed, neighbors observed Deborah and defendant fighting outside of her apartment and, later that day, defendant was observed inside the apartment with a knife.

(MCOA Op. at 1-2.)

As to the issue of premeditation, the court noted the following:

[T]he circumstances of the killing in this case indicate that defendant had sufficient time to take a second look. Deborah sustained 19 stab wounds, including cuts to her neck and carotid artery, and a severe blunt force trauma to back of her head. Between stabbing Deborah and striking her with the frying pan, defendant had the opportunity to reflect upon his actions. Defendant's conduct after the killing, including his lack of remorse and attempt to hide his involvement, is also relevant to the determination that the killing was premeditated. Throughout his interrogation, defendant denied killing Deborah and attempted to mislead the detective about how he sustained his hand injury. As such, the evidence presented regarding the relationship between defendant and his wife, defendant's actions before and after the crime, and the circumstances of the killing could persuade a rational trier of fact that the killing was premeditated and deliberate. . . .

The evidence also established a motive for the killing. Although proof of motive is not essential in a murder prosecution, it is always relevant and further serves to demonstrate premeditation. Defendant asserted that his wife had previously been unfaithful to him. Defendant told police that when he saw Deborah get out of a van containing other men he "couldn't take it anymore." A witness testified, while defendant and his wife were fighting, defendant had a knife and told Deborah, "If I can't have you, Bitch, there ain't [sic] nobody gonna [sic] have you."

(MCOA Op. 2 (citations omitted).)

The court of appeals also held that Defendant's testimony at trial, standing on its own, provided sufficient evidence to support a conviction for first-degree murder:

Defendant admitted that he killed Deborah. Despite asserting a belief that Deborah was planning to stab him, defendant remained in the apartment and procured two knives. Defendant acknowledged thinking that he was "gonna kill her." Defendant hit Deborah in the head with a frying pan and then stabbed her multiple times,

- 17 -

admitting that he had warned Deborah that if he ever began to assault her he would be unable to stop. . . .

(MCOA Op. 2-3.)

The state court's decision is not contrary to, or an unreasonable application of, Supreme Court precedent. Considering all of the evidence discussed by the court of appeals, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319. Thus, Petitioner's first claim is without merit.

### Ground II. Ineffective assistance of counsel: Petitioner's testimony

Next, Petitioner asserts that his counsel was ineffective for permitting him to testify in a narrative fashion. The Michigan Court of Appeals rejected this claim based on its review of the trial court record, noting that Petitioner did not move for a new trial or an evidentiary hearing to develop an additional record in support of his claim:

> Before defendant testified, his counsel informed the trial court, outside the presence of the jury, that defendant would be testifying in a narrative fashion. Based on the context of the discussion with the court, it is apparent that defense counsel determined he could not question defendant without violating the Michigan Rules of Professional Conduct, which prohibit the subornation of perjury. *See* MRPC 3.3. Defendant has failed to present any evidence that defense counsel's determination was unfounded. Thus, defendant has failed to establish that his trial counsel's decision to refrain from asking questions during his testimony was not objectively reasonable. *People v Knapp*, 244 Mich App 361, 385-386; 624 NW2d 227 (2001). The failure to present perjured testimony by one's client does not constitute ineffective assistance of counsel. *Nix v Whiteside*, 475 US 157, 166; 106 S Ct 988; 89 L Ed 2d 123 (1986); *People v Hubbard*, 156 Mich App 712, 715-716; 402 NW2d 79 (1986). Because no errors are apparent on the record to support defendant's claim of ineffective assistance of counsel, defendant is not entitled to relief.

(MCOA Op. 3.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. The

- 18 -

petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. In addition, Petitioner must establish that his counsel's ineffective assistance prejudiced him; Petitioner is not entitled to relief if counsel's errors had no effect on the judgment. *Id.* at 691.

As the Supreme Court has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner's counsel apparently believed that he could not present Petitioner's testimony through direct questioning because doing so would violate counsel's duty of candor to the

court. *See* MICH. R. PROF. COND. 3.3(a)(4), (c). A defense attorney faced with a client who insists on testifying falsely has few options. The option of informing the court that the client is testifying against advice of counsel and then allowing the defendant to proceed in a narrative fashion has its genesis in standard 7.7 of the ABA's *The Defense Function*, approved by the House of Delegates in 1971. Under this standard, if the client cannot be dissuaded from perjury and it is too late to withdraw, counsel should invite the defendant "to make his statement to the trier of fact." *ABA Standards for Criminal Justice, The Defense Function* § 7.7(c) (1971). Thereafter, courts overwhelmingly endorsed this option as the appropriate response by defense counsel. *See, e.g., People v. Andrades*, 828 N.E.2d 599, 602-03 (N.Y. 2005); *People v. Johnson*, 72 Cal. Rptr. 2d 805 (Cal. Ct. App. 1998); *Butler v. United States*, 414 A.2d 844, 850 (D.C. 1980) (*en banc*) ("We are persuaded that this approach is the preferable one and we reaffirm the implicit holdings of *Thornton* and *Johnson* that defense counsel, when in possession of substantial facts indicating that his client is going to commit perjured testimony before a jury, may, consistent with effective representation, follow the recommended procedures of Standard 7.7"); *Sanborn v. State*, 474 So. 2d 309, 313 (Fla. Dist. Ct. App. 1985) ("The procedure most often sanctioned in this situation is to allow the defendant to take the stand and deliver his statement in narrative form; the defendant's attorney does not elicit the perjurious testimony by questioning nor argue the false testimony during closing argument."); *People v. Lowery*, 366 N.E.2d 155, 157 (Ill. App. Ct. 1977) ("We approve of this standard [7.7] and its commentary and believe it is applicable to defense counsel's actions in this case"); *State v. Fosnight*, 679 P.2d 174, 180-81 (Kan. 1984) (conduct in substantial compliance with standard 7.7 approved); *In re Goodwin*, 305 S.E.2d 578, 580 (S.C. 1983) ("[W]e approve this procedure [7.7] as an acceptable method of balancing the conflicting interests, as it allows the lawyer to refrain from

actively participating in the presentation of the false testimony while according the defendant the assistance of counsel"). The alternative is to inform the court of the perjured nature of the client's testimony, an approach much more injurious to the client's interests. In *Nix v. Whiteside*, 475 U.S. 157 (1975), the Court held that defense counsel does not act ineffectively by refusing to present a client's perjured testimony. The Court suggested that counsel in this situation should inform the trial court of the client's perjury. 475 U.S. at 168-171. *A fortiori*, counsel does not act ineffectively in passively allowing the client to testify in a narrative fashion in these circumstances. *See McDowell v. Kingston*, 497 F.3d 757, 761-65 (7th Cir. 2007); *De Pallo v. Burge*, 296 F. Supp. 2d 282, 290-92 (E.D.N.Y. 2003); *Benedict v. Henderson*, 721 F. Supp. 1560, 1563-64 (N.D.N.Y. 1989); *Elkins v. Colorado*, No. 10-cv-2270, 2011 WL 3648371, at * 7-9 (D. Colo. Aug. 17, 2011); *Horne v. Horel*, No. C-07-4592, 2010 WL 934106, at * 25 (N.D. Cal. Mar. 15, 2010).

The only clearly established Supreme Court law in this area is established by *Nix*: defense counsel does not act ineffectively for refusing to present known or suspected perjury by the client. Beyond that, the Court has not prescribed clear guidelines. The Michigan Court of Appeals, like most other courts that have faced the issue, decided that allowing petitioner to testify in a narrative fashion was reasonable. The decision of the Michigan Court of Appeals was not contrary to or an unreasonable application of *Nix* or any other Supreme Court authority. Petitioner therefore fails on the performance prong of *Strickland* under the deferential standard of review required by AEDPA.

### Ground III.  Ineffective assistance of counsel: competency evaluation

Petitioner claims that his counsel was ineffective for failing to seek a competency evaluation in light of Petitioner's history of hospitalization for mental illness from 1977 to 1979. Petitioner raised this issue in his motion for relief from judgment.  The state court found this claim to be "completely without merit," noting that "[Petitioner]'s trial counsel did, in fact, seek and did obtain a mental competency evaluation . . . prior to trial. [Petitioner] was found to be competent." (3/12/2009 Op. & Ord. on Mot. for Relief from J. 2, docket #53.)  According to the trial court record, Petitioner was evaluated by a physician in January 2005, who determined that Petitioner was competent to stand trial.  (*See* 2/23/2005 Competency Hr'g & Status Conference Tr. 5, docket #21.) The trial court accepted that determination.  (*Id.* at 6.)

Petitioner offers no basis for questioning the state court's disposition of his claim. He asserts that his counsel failed to obtain information regarding his hospitalization from 1977 to 1979, but he fails to explain how those records would have been relevant to assessing his competence in 2005.  Moreover, according to Petitioner's own investigation, his hospital records for that time period were destroyed "in the late 1990's."  (Def.-Appellant's Br. on Appeal 5, docket #53.)  Petitioner cannot complain that his counsel was ineffective for failing to obtain records that were not available.

Petitioner also asserts that his counsel was ineffective for failing to request a second evaluation, because the court-ordered evaluation took place fourteen months prior to the trial. However, Petitioner fails to explain why the mere passage of time should have prompted an additional evaluation.  He does not claim that his mental capacity deteriorated or otherwise changed

during the time period between his evaluation and his trial. Thus, he fails to demonstrate that his counsel's conduct was unreasonable or that it prejudiced him in any way.

### Ground IV. Prosecutorial misconduct

Finally, Petitioner asserts that it was improper for the prosecutor to refer to Deborah as a "victim" throughout the trial, and to point his finger at Petitioner while calling him a "killer" and a "murderer."[2] During closing arguments, the prosecutor stated, "[T]here is only one person responsible for what happened last March 25th and he's seated right here. It's this man right here. He's the killer. He's a murderer and he's guilty of first degree murder." (Tr. VI, at 805.) The state court held that Petitioner's claims were "meritless," because the comments were not improper. (*See* 3/12/2009 Op. & Order on Mot. for Relief from J. 2, docket #53.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor engaged in improper conduct that "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact

---

[2]Petitioner also asserted in his motion for relief from judgment that the prosecutor displayed graphic crime scene photographs and improperly referred to Petitioner as "guilty"; however, Petitioner did not raise these issues when he appealed the denial of his motion. (*See* Def.-Appellant's Br. on Appeal, docket #53.) A petitioner must exhaust remedies available in the state courts before obtaining review of habeas claims. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To fulfill the exhaustion requirement, a petitioner must have fairly presented his claims to all levels of the state's appellate system. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Because Petitioner did not present these issues in the state appellate courts, he did not comply with the exhaustion requirement. Moreover, because he may file only one motion for relief from judgment per conviction, Mich Ct. R. 6.502(G)(1), he can no longer present these issues in state court. Thus, they are procedurally barred in this action. *See Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) ("If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred."), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 635 (2002).

of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

As the state court held, the prosecutor's remarks were not improper. It was not improper to refer to Petitioner's deceased wife as a victim, because there was no question that she was the victim of a murder. Also, it was entirely proper for the prosecutor to argue in his closing arguments that the evidence showed that Petitioner was the killer and murderer of his wife. In any event, even if there was any impropriety in the prosecutor's conduct, it could not have had a meaningful impact on the jury's verdict, because the court instructed the jury that the lawyers' statements were not evidence (Tr. VI, at 817), and the evidence itself overwhelmingly supported a guilty verdict. Therefore, because the prosecutor's conduct did not render Petitioner's trial fundamentally unfair, he is not entitled to relief on this claim.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.


Dated:   February 5, 2014                    /s/  Joseph G. Scoville
                                             United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); F<small>ED</small>. R. C<small>IV</small>. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).